2020R00926/RY



FILED
MAY 24 2021
AT 4:40 P M
WILLIAM T. WALSH
CLERK

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. (SDW) |
| | : | |
| | : | Crim. No. 21-430 |
| v. | : | |
| | : | 18 U.S.C. § 1347 |
| | : | 18 U.S.C. § 2 |
| ALEXANDER BALDONADO | : | |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

1. Unless otherwise indicated, at all times relevant to this Indictment:

### The Defendant

a. Defendant ALEXANDER BALDONADO was a resident of New York and a licensed physician. ALEXANDER BALDONADO was an enrolled Medicare provider and submitted claims to Medicare for payment.

### Relevant Entities and Individuals

b. "Lab Company 1" and "Lab Company 2" were laboratories located in New York with common ownership. Lab Company 1 and Lab Company 2 were enrolled Medicare providers and submitted claims to Medicare for payment.

c. "Lab Company 3" was a laboratory located in Secaucus, New Jersey. Lab Company 3 served as a reference laboratory that performed genetic testing on specimens referred by Lab Company 1 and Lab Company 2.

**The Medicare Program**

d.  The Medicare Program ("Medicare") was a federally-funded health care program that provided free or below-cost benefits to certain individuals, primarily the elderly, blind, or disabled. The benefits available under Medicare were governed by federal statutes and regulations. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services ("HHS"). Individuals who received Medicare benefits were referred to as "beneficiaries."

e.  Medicare was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

f.  Medicare was divided into four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B covered medically necessary physician office services and outpatient care, including laboratory tests.

g.  Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided items and services to Medicare beneficiaries were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

h.  When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure

code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted to Medicare seeking reimbursement were required to include: (i) the beneficiary's name and Health Insurance Claim Number ("HICN"); (ii) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (iii) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare were able to be submitted in hard copy or electronically.

   i. Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

   j. To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application for physicians and non-physician practitioners, CMS Form 855I, was required to be signed by the provider. CMS Form 855I contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions

are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) . . . ).

k. In executing CMS Form 855I, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

l. Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare.

m. In certain limited circumstances, Medicare permitted laboratories to establish arrangements with so-called "reference laboratories." Such arrangements existed when a laboratory received a specimen for testing, but instead of testing the specimen in-house, the laboratory acted as a "referring laboratory" by sending the specimen to another laboratory, the "reference laboratory," to complete the testing.

### Genetic Tests

n. Cancer genetic tests were laboratory tests that used DNA sequencing to detect mutations in genes that could lead to a higher risk of developing cancer or to assist in the treatment of an existing cancer. Cancer

genetic tests were not a method of diagnosing, in the first instance, whether an individual had cancer.

   o. In order to have a cancer genetic test performed, an individual typically provided a saliva sample, which contained DNA material ("specimen"). The specimen was then transmitted to a laboratory for testing.

   p. DNA specimens were submitted along with laboratory requisition forms that identified the patient, the patient's insurance, and the specific test to be performed. In order for laboratories to submit claims to Medicare for cancer genetic tests, the tests had to be approved by a physician or other authorized medical professional who attested to the medical necessity of the test.

   q. Medicare did not cover diagnostic testing, including cancer genetic testing, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

   r. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a), provided that "all diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

## COUNTS 1 – 6
## Health Care Fraud

2. Paragraph 1 of this Indictment is realleged here.

3. From in or around November 2018 and continuing through in or around May 2021, in the District of New Jersey and elsewhere, the defendant,

ALEXANDER BALDONADO,

in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, a health care benefit program as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare.

### Goal of the Scheme and Artifice

4. It was the goal of the scheme and artifice for defendant ALEXANDER BALDONADO and his accomplices to unlawfully enrich themselves and others by, among other things, (a) submitting and causing the submission of false and

fraudulent claims to Medicare for services that were medically unnecessary, ineligible for reimbursement, and not provided as represented; (b) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds of the fraud; and (c) diverting proceeds of the fraud for their personal use and benefit, for the use and benefit of others, and to further the fraud.

**The Scheme and Artifice**

5. The manner and means by which defendant ALEXANDER BALDONADO and his accomplices sought to accomplish the goal of the conspiracy included, among others, the following:

a. Beginning in or around November 2018, defendant ALEXANDER BALDONADO and his accomplices devised a scheme in which they submitted and caused the submission of false and fraudulent claims to Medicare for services, including cancer genetic tests and physician office visits, that were medically unnecessary, ineligible for reimbursement, and not provided as represented.

b. On or about March 24, 2020, defendant ALEXANDER BALDONADO falsely certified to Medicare that he would comply with all Medicare rules and regulations, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare.

c. In or around September 2020, during the national emergency and global pandemic caused by the novel coronavirus disease 2019 ("COVID-19"), defendant ALEXANDER BALDONADO and his accomplices gained access

to Medicare beneficiaries and their genetic samples by offering COVID-19 testing to residents living in a retirement community.

  d. Defendant ALEXANDER BALDONADO ordered cancer genetic tests for Medicare beneficiaries even though: in some cases, the beneficiaries were seeking only COVID-19 testing; he was not treating the beneficiaries for cancer, symptoms of cancer, or any other medical condition; he did not use the test results in the treatment of the beneficiaries or the management of their care; and he did not conduct a patient visit or consultation that would justify approval of the orders for genetic testing on the beneficiaries.

  e. Defendant ALEXANDER BALDONADO signed cancer genetic testing laboratory requisition forms for Medicare beneficiaries falsely certifying and attesting that the tests were medically necessary for the diagnosis or detection of a disease or disorder and that the results would be used in the medical management and care decisions for the beneficiary.

  f. Defendant ALEXANDER BALDONADO and his accomplices falsified and altered laboratory requisition forms, including by adding false information about the Medicare beneficiaries' personal and family history of cancer, to falsely represent the medical necessity of the cancer genetic tests.

  g. Defendant ALEXANDER BALDONADO submitted and caused to be submitted false and fraudulent claims to Medicare for services, including lengthy office visits, for Medicare beneficiaries for whom he ordered cancer genetic tests, including beneficiaries to whom defendant ALEXANDER BALDONADO and his accomplices gained access by offering COVID-19 testing

to residents living in a retirement community. These services were medically unnecessary, ineligible for reimbursement, not provided as represented, and never actually rendered.

        h.      Defendant ALEXANDER BALDONADO did not explain the results of the cancer genetic tests to the Medicare beneficiaries for whom he ordered the tests, and the beneficiaries rarely received the results from the tests, which were conducted by Lab Company 3 in New Jersey, pursuant to a reference agreement with Lab Company 1 and Lab Company 2.

        i.      Defendant ALEXANDER BALDONADO caused Lab Company 1 and Lab Company 2 to submit in excess of approximately $17 million in false and fraudulent claims to Medicare for genetic tests that were medically unnecessary, ineligible for reimbursement, and not provided as represented. Medicare paid Lab Company 1 and Lab Company 2 in excess of approximately $1.7 million based on these false and fraudulent claims.

        j.      Specifically with respect to claims for genetic tests for beneficiaries for whom ALEXANDER BALDONADO also ordered a COVID-19 test during the COVID-19 national emergency, defendant ALEXANDER BALDONADO caused Lab Company 1 and Lab Company 2 to submit in excess of approximately $2 million for genetic tests that were medically unnecessary, ineligible for reimbursement, and not provided as represented. Medicare paid Lab Company 1 and Lab Company 2 approximately $350,000 based on these false and fraudulent claims.

## Executions of the Fraudulent Scheme

6. On or about the dates specified below, in the District of New Jersey and elsewhere, defendant ALEXANDER BALDONADO, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, submitted and caused to be submitted the following false and fraudulent claims to Medicare for cancer genetic tests that were billed to Medicare by Lab Company 1, performed by Lab Company 3 in New Jersey, medically unnecessary, ineligible for reimbursement, and not provided as represented, in an attempt to execute, and in execution of, the scheme as described in Paragraphs 3 through 5, with each execution set forth below forming a separate count:

| Count | Medicare Beneficiary | Approx. Claim Date | Procedure Code | Ordering Provider | Approx. Amount Billed to Medicare |
|---|---|---|---|---|---|
| 1 | A.B. | 9/11/20 | 81162 | ALEXANDER BALDONADO | $2,395.80 |
| 2 | F.B. | 9/11/20 | 81162 | ALEXANDER BALDONADO | $2,395.80 |
| 3 | B.B. | 9/10/20 | 81162 | ALEXANDER BALDONADO | $2,395.80 |
| 4 | I.B. | 9/10/20 | 81162 | ALEXANDER BALDONADO | $2,395.80 |
| 5 | R.S. | 9/26/20 | 81162 | ALEXANDER BALDONADO | $2,395.80 |
| 6 | D.L. | 9/10/20 | 81162 | ALEXANDER BALDONADO | $2,395.80 |

Each in violation of Title 18, United States Code, Section 1347 and Section 2.

## FORFEITURE ALLEGATIONS

1. The allegations contained in Counts 1 through 6 of this Indictment are realleged here for the purpose of alleging forfeiture against defendant ALEXANDER BALDONADO.

2. Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the offenses charged in Counts 1 through 6 of this Indictment, defendant ALEXANDER BALDONADO shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

### Substitute Assets Provision

3. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of defendant ALEXANDER BALDONADO up to the value of the forfeitable property described above.

A True Bill,

███████████████
Foreperson

_Rachael A. Honig_
RACHAEL A. HONIG
Acting United States Attorney

DANIEL KAHN
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

ALLAN MEDINA
Chief, Health Care Fraud Unit
Criminal Division, Fraud Section
United States Department of Justice

JACOB FOSTER
Assistant Chief
Criminal Division, Fraud Section
United States Department of Justice

_Rebecca Yuan_
REBECCA YUAN
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice

CASE NUMBER: 21-430(SDW)_____

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

**UNITED STATES OF AMERICA**

v.

**ALEXANDER BALDONADO**

## INDICTMENT FOR

**18 U.S.C. §§ 1347, 2**



RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

REBECCA YUAN
TRIAL ATTORNEY
(202) 262-3520